## COMMONWEALTH v. STAUFFER.

Conditions in restraint of marriage are valid in devises of real estate.

Testator devised his real and personal estate to his wife, provided she remained a widow for life; but in case she married again, she was to leave the premises. If she remained a widow for life, the testator devised all his property, after her death, to his father and mother, if living; if not, to others. The land was sold for payment of debts, and the widow married. The testator's father died before the marriage of the widow: His mother is entitled to recover the surplus proceeds of the real estate.

In error from the Common Pleas of Lancaster.

Case stated. The question being the right to the surplus proceeds of the real estate of William Geigley, the younger, which had been sold under an order of the Orphans' Court, for payment of debts. His will was as follows:—

"I will and bequeath to my loving wife, Susan Geigley, all my real and personal estate that I am possessed of (with a few exceptions that I will hereafter bequeath to my brother George), provided my wife Susan remains a widow during her life. But in case she should marry again, my will is, she then shall leave the premises, and receive all the money and property she had of her own, or that I received of hers. * * * It is my will and desire, that if my wife remains a widow during her life on the premises, that after her death, all the money and property that I got or had of my wife's, shall be paid to her friends, whomsoever she wills it to; and all the property belonging to me as my own at my death (not including my wife's part), I will and bequeath to my father and mother, if living. But if they are both deceased, my will is, that my brother George Geigley, and my sister Catharine Geigley, shall have the whole of that share or part that was my own, to them, their heirs and assigns for ever."

The sale was made to defendant in April, 1834. William Geigley, the elder, the father of testator, died in January, 1835. In that year Susan Geigley, the widow of the testator, married. Ann Geigley, his mother, died in 1847, and the question was, whether her administrator was entitled to the proceeds of the sale of the real estate in the hands of the purchaser. In 1834 William Geigley, the elder, received a sum of money from the defendant, as the true balance of the proceeds of the real estate, and executed a release to Susan Geigley, who had become the purchaser of the land. Susan Geigley also released to the defendant in 1834.

LEWIS, P. J. (after stating the will).—"The real estate was sold for the payment of debts, under an order of the Orphans' Court,

and the widow having married a second husband, the present action is brought by the representatives of the testator's mother (who survived her husband), to recover the balance of the proceeds of sale in the hands of the defendant. There are other facts upon this record, which are thrown out of consideration, because the case is determined exclusively on the question arising upon the condition in restraint of marriage. A distinction has been supposed to exist, certainly more inveterate than rational, in favour of *limitations* as opposed to *conditions* of this description, but a review of the cases on which this distinction is supposed to exist, is dispensed with, because the case before us is the case of a *condition*. It may not be amiss, however, to remark, that the Vice-Chancellor of England, so late as November, 1846, without taking notice of the supposed distinction in favour of *limitations*, held, in general terms, that ' all *limitations* in restriction of marriage were objectionable:' Elizabeth Castle's case, L. Jurist, Dec. 26, 1846. A condition *precedent* stands on peculiar ground, and has been sustained upon the technical principle that the estate does not vest until the condition is performed. But the decisions on this branch of the law are also thrown out of consideration, because the case of this record is that of a condition *subsequent*. The estate has vested, and is not divested by a disregard of the condition, if the latter be against the policy of the law. The adjudications on conditions requiring the *consent* of *parents* or *others standing in their place*, stand also upon a principle not involved in the case before us. There may be circumstances to justify a reasonable restriction of this nature, to guard youthful indiscretion against imposition. But wherever no sufficient reason exists for withholding consent, or the consent itself is required for the purpose of restraining the marriage, the condition is disregarded: 2 Atk. 261; Amb. 662. A restraint even for six years, without any justifiable reason for it, has been considered as falling within the prohibition: 10 East, 22.

"It has been held that a devise over to a secondary devisee, upon the violation of the condition, was a circumstance which would justify the courts in sustaining conditions of this kind. This circumstance cannot relieve a condition in restraint of marriage from the objections founded upon the great principle of public policy involved; and it is rapidly losing its power, as the light breaks upon the judicial mind. It has been held that a residuary clause, or a devise over without a particular description of the property to pass by it, will not enable the courts to enforce the forfeiture. A devise over to the heir-at-law will be equally inoperative: .6 Mass. 169. A

devise which does not *create* an interest to take effect *immediately* upon the happening of the contingency, will be equally ineffectual: Ib. The decisions in which these principles have been announced, may be regarded as the vigorous struggles of the common law to free itself from a doctrine resting upon no substantial foundation. But we are not controlled by the cases on this branch of the subject, because we have here no devise over upon the happening of the forbidden contingency. The devise over presupposes the enjoyment of the estate by the widow '*during her life,*' and is to take effect, *not upon her marriage*, but '*after her death.*' Distinctions resting upon the question whether the legacy is payable out of the *real* or *personal estate*, are said to exist. But Mr. Justice Kennedy, in an able opinion delivered in the case of Middleton *v.* Rice, 6 Penn. Law Jour. 234, cites from Mr. Jarman's edition of Powell on Devises, vol. 2, 291, the opinion there given, that, ' even in regard to the real estate, it seems generally admitted that *unqualified* restrictions on marriage are void.' And the learned judge further remarks, that ' this is the universal opinion entertained by judicial men on this point :' 6 Penn. Law Jour. 234.

"It may well be doubted whether the English decisions, so far as they in any respect countenance restrictions upon marriage, are applicable to the exigencies of a newly established nation. Possessing an extent of uncultivated territory almost unlimited, and relying upon the increase of population as the chief element of national strength, it would seem to be the policy of this country to discountenance every restraint upon that legitimate intercourse which results in the reproduction of the human race. Our ancestors may be considered as having brought with them the wholesome doctrines of the common law, without the embarrassments produced by departures from its principles, under the constraint of circumstances peculiar to a country already overstocked with inhabitants. A principle which generally governed the common-law courts is, that ' if a portion be given in consideration that the daughter should *never* marry, such a condition will be rejected as repugnant to the original institution of mankind :' Com. R. 729. And the doctrine which prevailed in the ecclesiastical courts was, that ' all conditions against the liberty of marriage are unlawful, as being a restraint on the natural liberty of mankind, and an hindrance to the propagation of the species :' 4 Burns's Ecc. Law, 152. Marriage is a wise regulation, in harmony with nature and religion, and is the only efficient preventive of licentiousness. The happiness of the parties, and the interests of society, require that it should be free

from either coercion or restraint. Bonds to procure, and contracts and conditions to restrain, are alike forbidden. It is the appropriate regulation of that great.instinct of nature which was designed by the Creator to replenish the earth. It is upon this authorized union that all civilized nations depend for their prosperity in peace, and their defence in war.

" The principle of reproduction stands next in importance to its elder born correlative, self-preservation, and is equally a fundamental law of existence. It is the blessing which tempered with mercy the justice of expulsion from Paradise. It was impressed upon the human creation by a beneficent Providence, to multiply the images of himself, and thus to promote his own glory and the happiness of his creatures. Not man alone, but the whole animal and vegetable kingdom are under an imperious necessity to obey its mandates. From the lord of the forest to the monster of the deep—from the subtlety of the serpent to the innocence of the dove—from the celastic embrace of the mountain kalmia to the descending fructification of the lily of the plain, all nature bows submissively to this primeval law. Even the flowers which perfume the air with their fragrance, and decorate the forests and fields with their hues, are but ' curtains to the nuptial bed.' The principles of morality—the policy of the nation—the doctrines of the common law—the law of nature and the law of God—unite in condemning as void, the condition attempted to be imposed by this testator upon his widow."...

Judgment for the defendant.

*Heister* and *Parke*, for plaintiff in error.—Conditions in restraint of marriage, are operative in devises of real estate: 1 Rop. on Leg. 327; 1 Stor. Eq. 285–8; Amb. 209; 7 Conn. 568; 3 Wh. 575; 1 Atk. 380. And the courts incline to support them where the intent is obvious: 10 W. 148; 2 Barr, 301; 4 Ib. 102. Here there was a devise over. The release of the widow enured to the benefit of the estate: 1 Pet. C. 373. The proceeds of land pass as the land: Acts 1834, §19, 1833, §18. The devise over was to the survivor, at the termination of the particular estate: 9 W. 349; 7 L. J. 360; 1 W. & S. 160.

*McElroy*, contrà.—This is a condition in restraint of marriage, and as such forbidden by the law, as well in the case of real as personal estate: 1 Stor. Eq. 288. The only restrictions on marriage allowed by the law, are those dictated by the soundest

policy and the purest morality: 1 Fonb. Eq. ch. 1, §4, n. 10. A devise over, which operates in restraint of marriage, is void: Hoopes *v.* Dundas, *antè*, 75. The property is purely personalty: 11 S. & R. 234; 4 Barr, 363. It was paid to the husband of the present claimant's intestate. After an estate has been settled by agreement, this is not to be disturbed: 7 W. 71; 6 W. 161.

*June* 14. GIBSON, C. J.—This action is brought for surplus proceeds of land devised to the testator's widow, for life, on condition not to marry; but sold by order of the Orphans' Court, for payment of his debts. She did marry shortly after the sale; and the question is, whether a subsequent condition, in general restraint of marriage, when annexed to a devise of land, is void, for reasons of public policy. When annexed to a legacy, the decisions of the ecclesiastical courts, followed in chancery, have certainly established that it is; and so the rule is held in Pennsylvania, both at law and in equity, as is shown by McIlvaine *v.* Gethen, 3 Whart. 575, and Hoopes *v.* Dundas, *antè*, 75. But, it is said, in 2 Powell on Dev. 282, that the rule of the ecclesiastical courts in legatory cases are inapplicable to devises of land, or money charged upon it; and that it owes its existence, in any case, to the ecclesiastical judges, who borrowed most of their rules from the civil law. The same thing is repeated in 1 Jarman on Wills, 836, and fortified by references to Reeves *v.* Herne, 5 Vin. 393, pl. 46; Harvey *v.* Aston, 1 Atk. 361; Reynish *v.* Martin, 3 Atk. 330; Stackpole *v.* Beaumont, 3 Ves. 96; and the cases collected in Mr. Sanders' note to Harvey *v.* Aston; to which may be added the great case of Fry *v.* Porter, 1 Mod. 308. The ground on which these precedents stand is the indisputable fact that devises of land are governed, not by the Roman, but by the common law. Yet, a mistaken notion has been entertained, that restraint of marriage, to be valid in a devise of land, must not be general; but that would bring such a devise to the level of a bequest of chattels, and abolish the distinction between legacies and devises altogether. Yet the notion has received colour from the very same text-writers, who, in 2 Powell on Dev. 291, and 1 Jarman on Wills, 843, have asserted that, even in regard to devises of land, it seems to be generally admitted (by whom?) that unqualified restrictions on marriage are void, on grounds of public policy; though the point rests, they say, rather on principle than decision. I know of no policy on which such a point could be rested, except the policy which, for the sake of a division of labour, would make one man maintain the children

begotten by another? It would be extremely difficult to say, why a husband should not be at liberty to leave a homestead to his wife, without being compelled to let her share it with a successor to his bed, and to use it as a nest to hatch a brood of strangers to his blood. Such is not the policy of the statute of wills, which allows a man to devise his land "at his own free will and pleasure;" nor is it the policy of the common law, which allows him to give his property on his own terms, or not at all; and, if he might not do the one, he would assuredly do the other: so that it is not easy to see how the cause of population would be promoted by binding his hands. To throw the widow of a landless merchant on her dower at the common law, would not do it. It may be the present policy of the country to encourage reproduction—though the time will certainly come when excess of population will be a terrific evil here, as it is elsewhere—but no political regulation, which looks no further than inducements to second marriage, will either advance or retard it.

It is therefore hard to discern the policy that has been glanced at by the text-writers. It may seem to them, as it did to the judge who ruled the cause below, that a condition in general restraint of marriage is contrary to an instinct of our nature, which it would consequently be sinful to oppose. But the intercourse between the sexes is a legitimate subject of civil regulation; for the land would be filled with violence and blood if it were not. It would be impious, if it were possible, to suppress it; but a gift on condition not to marry leaves the donee free as air to do anything, at pleasure, but divert it to uses for which it was not intended. The truth is, the notion is the product of the Roman law, adopted, as it was, with modifications, by the ecclesiastical judges; and how far the Romans were driven, by waste of life in their ceaseless wars, civil, servile and foreign, to force the growth of population by concubinage as well as marriage, and by the imposition of a mulct upon celibacy, is matter of school-boy history. But that the rules thus borrowed have not been eventually applied by the common-law courts to land, is shown by Goodright v. Glazier, 4 Burr, 2512, in which it was ruled that a prior uncancelled will is not revoked by a subsequent cancelled one; a precedent followed by this court in Flintham v. Bradford, antè, 82. In Harvey v. Aston, Comy. Rep. 729, it was indeed intimated that the rule of the ecclesiastical courts, in regard to conditions, ought to be followed by the other courts, for the sake of uniformity; the absurdity of which was forcibly exposed by Lord Rosslyn, in Stackpole v. Beaumont, 3 Ves. 89. "In deciding questions that arise on legacies out of land,"

said he, "the court, very properly, followed the rule which the common law prescribes, and common sense supports, to hold the condition binding where it is not illegal. Where it is illegal, the condition would be rejected, and the gift pure. When the rule came to be applied to personal estate, the court felt the difficulty, upon the supposition that the ecclesiastical court had adopted a positive rule from the civil law, upon legatory questions, and the inconvenience of proceeding by a different rule in the concurrent jurisdiction (it ought not to be called so), in the resort to this court, instead of the ecclesiastical court, upon legatory questions; which, after the restoration, was very frequent, and, in the beginning, embarrassed the court. Distinction upon distinction was taken to get out of the supposed difficulty. How it should ever have come to be a rule of decision in the ecclesiastical court, is impossible to be accounted for but on this circumstance, that in the unenlightened ages, soon after the revival of letters, there was a blind superstitious adherence to the text of the civil law. They never reasoned, but only looked into the books, and transferred the rules, without weighing the circumstances, as positive rules to guide them. It is beyond imagination, except from that circumstance, how, in a Christian country, they should have adopted the rule of the civil law, with regard to conditions as to marriage."

So much for the support which the notion receives from principle; and now for the support which it receives from precedent. For the latter, we are referred to the supposed inclination of Lord Ellenborough's mind, in Perrin v. Lyon, 9 East, 183, thought to be intimated by his remark on a condition not to marry a man of Scottish birth, that he "saw no ground to hold the condition to be void, as being in general restraint of marriage;" whence an inference that he would have done otherwise, though the gift was of realty, had the restraint not been special. He said no more, however, than that the limited terms of the condition relieved him from the necessity of deciding the broad question; from which no more can be inferred than that he may have thought it a debateable one. The Nisi Prius opinion of our late brother Kennedy, in Middleton v. Rice, 6 Penna. L. Journ. 234, is more formidable, not only because of his great learning and experience, but because it furnishes the only direct authority for the notion that is to be found in the English or American books. But it is directly opposed by a solemn decision of this court in Bennett v. Robinson, 10 W. 348. True, that was the case of a conditional limitation; but, if it were contrary to the law of nature, it would be equally

inoperative as a condition, either in respect to land, or in respect to a legacy: it could not be good as to the one and bad as to the other. But, whether the restraint be by limitation or condition, is, in a vast majority of cases, the effect of accident, depending on the turn of expression habitual to the scrivener, who seldom knows anything of the technical difference between them. If the rule of the ecclesiastical courts were applicable to land, it would be easily evaded by using words of limitation instead of words of condition; and thus it would have no greater effect on devises in restraint of marriage, than the statute of uses had on trusts, which worked a change only in the words necessary to create them.

The difficulty in the application of the common-law rule to the case before us, is the want of an entry to determine the widow's estate for the condition broken, which is generally necessary to divest a freehold, though not to divest a term for years. Here, however, an entry was impossible, for the land was sold before the widow's marriage. Had the condition been broken before the decree, there might have been an actual entry, though perhaps even then it would not have been indispensable; but, since it has been converted, her right to the money substituted for the land, is extinguished by the simple adverse claim of it. Her administrator, therefore, is not entitled to recover.

> Judgment reversed, and judgment rendered for the plaintiff for $334 and costs of suit.